[Cite as *State v. Al-Shami*, 2026-Ohio-453.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115077 |
| v. | : | |
| BENJAMIN AL-SHAMI, | : | |
| Defendant-Appellant. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; VACATED IN PART
**RELEASED AND JOURNALIZED:** February 12, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695526-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Steven N. Szelagiewicz, Assistant Prosecuting Attorney, *for appellee.*

Gregory T. Stralka, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Benjamin Al-Shami ("Al-Shami") appeals his convictions for 14 counts of rape. After a jury trial, he was found guilty of committing numerous acts of anal intercourse and cunnilingus upon his daughters, N.A. ("Child A") and N.L. ("Child B"). In this appeal, he asserts that there was

insufficient evidence to support 14 separate counts of rape.  He does not contest his convictions for ten counts of gross sexual imposition ("GSI").  For the reasons that follow, we affirm in part and vacate in part.  Counts 13 and 29 in the original indictment, renumbered as Counts 6 and 22, are hereby vacated.[1]  The remaining counts and sentences are affirmed.

## I.  Facts and Procedural History

{¶ 2}  In October 2024, Al-Shami was charged in a 31-count indictment that included 19 counts of rape and 12 counts of GSI, spanning an eight-year timeframe, and naming three victims.  Prior to trial, however, the State dismissed the first five counts of rape and two counts of GSI as it related to one victim.

{¶ 3}  Al-Shami was charged with four counts of rape, in violation of R.C. 2907.02(A)(2) (force) as it pertained to Child A.  Two of the counts alleged cunnilingus, and two of the counts alleged anal intercourse.  In addition, he was charged with one count of GSI, in violation of R.C. 2907.05(A)(1).  The alleged offenses occurred between January 28, 2022, and June 24, 2023.[2]

{¶ 4}  The remaining counts pertained to Child B and included ten counts of rape.  Nine counts alleged violations of R.C. 2907.02(A)(1)(b) (victim under 13) and one count alleged a violation of R.C. 2907.02(A)(2) (force).  One count alleged

---

[1] The trial court renumbered the indictment after the State dismissed the first seven counts but before the jury trial.  In this opinion, we will refer to the original numbering in the indictment.

[2] Child A was named as the victim in original Count Nos. 8-12 and renumbered as Count Nos. 1-5, respectively.

cunnilingus when the victim was under the age of ten, and three counts alleged cunnilingus when the victim was between 10 and 13 years of age. Two counts alleged anal intercourse when the victim was under the age of 10, three counts alleged anal intercourse when the victim was between 10 and 13 years of age, and one count alleged anal intercourse by force. Al-Shami was also charged with nine counts of GSI, in violation of R.C. 2907.05(A)(1). The alleged offenses occurred between December 14, 2016, and January 31, 2024.[3]

{¶ 5} The following is a summary of the testimony adduced at trial.

{¶ 6} At trial, Child B testified that she was born December 14, 2010, and that Al-Shami was her father. Child B testified that she lived with Al-Shami, his girlfriend Jackie ("Jackie"), and Child B's six siblings. She explained that the first incident happened when she was approximately six years old and living on Hough Avenue in Cleveland, Ohio. She stated that she shared a room with her sister, Child A, when Al-Shami came in during the night and tried "to put his area in [her] behind." (Tr. 144.) She testified that she was sleeping on her stomach and was half asleep when she felt Al-Shami on top of her. She said he felt heavy. She stated that he pulled her pajama bottoms partially down. She testified that she "didn't like it. It was just there. Like, it didn't feel like he was trying to get in." (Tr. 145.) She confirmed that "his area" is Al-Shami's penis and her "behind" was the hole in her buttocks. (Tr. 145 and 205.) In her interview at Canopy Child Advocacy Center

---

[3] Child B was named as the victim in original Count Nos. 13-31 and renumbered as Count Nos. 6-24, respectively.

("CAC"), which was played for the jury, she stated that she remembered that it felt wet and uncomfortable and he told her not to make noise. (State's exhibit No. 14A.) Child B testified that she did not tell anyone at that time.

{¶ 7} The second incident happened during the daytime while she was lying in bed on her stomach under her older sister Child A's blanket. At the time, they still lived on Hough. That particular day, she was "in trouble" for drinking out of the sink. (Tr. 150.) She testified that Al-Shami pulled her pants partially down and his pants partially down. She stated that he moved his penis between her buttocks, "not the part where I can be penetrated." (Tr. 154.) After this incident, she told her mother, Jessica ("Jessica"), but nothing happened.

{¶ 8} Child B relayed that when she was eight-years old, she began wearing bras and it was then that Al-Shami started putting his mouth on her breasts. This started when they were living with Al-Shami's mother. She also testified that she would have to "move [her] hand vertically on his private area . . . to get the poison out." (Tr. 156.) She testified that she believed that she was helping to get the poison out until she was ten years old then she realized it was not true. She described his penis as "long. It was thick. It was like it had somebody's head on it, like someone with a bald, just the bald hairstyle on his head." (Tr. 173.) She testified that this happened too many times to count.

{¶ 9} Child B described a time while living on Coit Road in Cleveland, when Al-Shami entered the shower and put his mouth on her breasts and then put his "private area" in her "behind" and "it hurt." (Tr. 176.) She said it hurt during

and after the incident. When asked if this was the first time it hurt, she responded, "I don't think so, but I don't remember the first time that I recall it hurting back there." (Tr. 176.)

{¶ 10} Child B described another time when she was told by Al-Shami to go to his bedroom and he put his "private" in her "behind." She said she was nine-years old at the time and "[i]t hurt." (Tr. 180.) She thought this might have been the time when Al-Shami put "Sunny Bunnies" on his phone for her to watch while he put his "private area in [her] behind." (Tr. 180.) She testified that watching the show did not help.

{¶ 11} Child B testified that starting in 2020, when she was still nine years old, Al-Shami "started putting his mouth around [her] private area." (Tr. 157.) She confirmed that her "private area" was her vagina and that he was licking the inside. She could not say the word "licking," so she spelled it for the jury. She remembered it started during COVID because everyone was wearing masks while they were inside. They were living in a house on Coit Road in Cleveland where she lived from approximately the summer of 2019 to the summer of 2021. She testified that it happened in Al-Shami's bedroom. She said she was thinking that "this is the most uncomfortable thing [she] ever felt." (Tr. 164.) Child B testified that this happened so many times she could not count, but at least once a month at random. These types of incidents happened in Al-Shami's room, her room, and the living room.

{¶ 12} Child B described another incident that occurred while they were living on Coit Road where Al-Shami put his mouth on her "private area" that

occurred on the couch after she returned from a visit with Jessica. She described that she was on her back and Al-Shami removed her pants before putting his mouth on her private area.

{¶ 13} When the family moved to a house on Clybourne Avenue in Cleveland sometime in 2021, she testified that the sexual abuse continued. Child B remembered that the first incident happened in her new bedroom. She testified that Al-Shami put his "private area" in her "behind" and it hurt. Then he "put his mouth on her private area [vagina] . . . and also the area where bras are necessary [breast]." (Tr. 185-186.) She testified that "I believe each time that he's done that [anal penetration], I believe each time it has hurt the same, but I could be wrong." (Tr. 185.)

{¶ 14} Child B testified that she often tried to tighten her buttocks to stop him but she was not always successful. She remembered a time when she was in her room and Al-Shami tried to put his "private" in her "behind" and she tightened her buttocks. Al-Shami then told her that Child A would let him because she was a good girl. She testified that when he was trying to get it in her "behind," it hurt. She described his penis as "[i]n the middle, kind of like soft, hardish. . . . [k]ind of, like, straight." (Tr. 173.)

{¶ 15} Child B also described another time when they were living on Clybourne and Al-Shami let her eat his cupcake, then afterwards he told her she had to give up her private area in return. He then "put his mouth on that area." (Tr. 204.)

{¶ 16} Child B testified that at one point, she told Jackie but Jackie and Al-Shami made her feel guilty, stating that her siblings would grow up without a father and the couple would not be able to get married. She testified that she gave Al-Shami a second chance because she did not want her siblings to grow up without their father. She testified that it stopped for about two months after she reported it to Jackie but then it started again. Child B testified that the sexual abuse happened just as often as when they lived on Coit.

{¶ 17} Child B testified that the last incident happened on January 31, 2024, when he locked her in the bathroom and put his "private area" in her "behind" and made her sit on the ledge of the tub and rub her hands "vertically on his private area." (Tr. 194.) She testified that she asked him if he could do this with his Jackie, to which he replied, "I'll do that with her later." (Tr. 196.) She testified that it did not hurt because he was "just rubbing it around there." (Tr. 195.) She stated that her little sister, L.A., was sitting at the dining room table waiting for her when she came out of the bathroom. Child B testified that she told Jackie soon after that incident. She was taken to the hospital by Jackie and Al-Shami that evening but left before seeing a doctor. She explained that the next day, she went to live with her mother. She estimated the incidents happened approximately 24 times each year. They happened in his bedroom, her bedroom, and on the couch.

{¶ 18} The State then called Child A. Child A testified that she was born January 28, 2009, and she was the oldest sibling of seven. She testified that Al-

Shami was her father, and she repeatedly stated that she loved Al-Shami and only wanted her family back together. She made it clear that she did not want to testify. She testified that she was currently living in foster care. Child A acknowledged that the activity started when she was "maybe 14, maybe 15." (Tr. 240.) The first incident happened after she talked to Jackie, who is her mother, and Al-Shami about "woman stuff." (Tr. 241.) It happened in her bedroom, and she used the metaphor "Eve ate the apple" to describe what happened. (Tr. 244-245.) When questioned, it was revealed that "the apple" was her vagina and "Eve" was Al-Shami. She testified that "[s]omething else probably happened that day, but [she doesn't] remember that day." (Tr. 246.) She testified that it happened more than once and it happened in the living room on the couch and in another bedroom. She also had to perform "hand business" on his genitals, but "probably only did that once." (Tr. 248-249.) Child A went on to describe "hand business" as shaking a pop but the pop was Al-Shami's genitals. When questioned whether anything else happened, Child A testified that she "purposely forgot" things. (Tr. 250.)

{¶ 19} At one point, Child A reported to Jackie what was happening but Jackie told her not to tell anyone because she "wanted her family to stick together." (Tr. 250.) The next person she informed was her manager at McDonald's when Child A had "a breakdown" at work. (Tr. 250.) She testified that she did not remember what she said but what happened "might have slipped out." (Tr. 253.) She stated that she "wanted to keep [Al-Shami] safe." (Tr. 255.) In her CAC

interview that was played for the jury, Child A stated that after her accusations came to light, she was put in a "psych ward." (State's exhibit No. 12.)

{¶ 20} Child A testified that when Child B revealed what was happening to her, she "was upset. [She] didn't want anything to happen to anyone else. [She doesn't] care about [herself]. [She does not] care about [herself] at all. [She] just wanted to protect [Al-Shami] and the rest of [her] family." (Tr. 255.) Nevertheless, Child A testified that she did not believe her sister because she was not Al-Shami's "type." (Tr. 256.) State's exhibit No. 11 was identified by Child A as a note she had written when she was being "pressured" by the social worker. (Tr. 258.) The note stated: "My sister said [Al-Shami] did something to her. [Child A] doesn't believe it, because this happened to [her] before. [Al-Shami] swore he would never do that again. [Al-Shami] isn't a fan of [Child B] either[.]" (Tr. 259 and State's exhibit No. 11.) She testified that she was mad at Child B because she separated the family. She testified that "[Al-Shami] was going to church and he was praying. He was doing really good. Then she had to bring it up all over again right after he was healing and working on himself." (Tr. 261.)

{¶ 21} L.A. testified next. She stated that she was born in February 2014 and that her parents were Al-Shami and Jackie. She explained that Child A and Child B were her older sisters. She testified that one day, when the family was cleaning, she tried to get in the bedroom to clean but the door was locked, so she climbed through the vent and ended up under the bed. While she was under the bed, she could hear Child B crying and hardly breathing. She could also hear Al-

Shami breathing hard. She stated that she kept getting hit in the head by the mattress. She testified that Child B was not moving but Al-Shami was moving. L.A. testified that she stayed under the bed until Al-Shami left the room. She explained that afterwards she went to her room and locked the door because she was scared "[b]ecause [she knew] what was going on, because [Al-Shami] did it before." (Tr. 312.)

{¶ 22} Regarding the last incident on January 31, 2024, L.A. testified that she was sitting at the dining room table facing the bathroom door when Child B and Al-Shami were in the bathroom. She explained that she asked one of her brothers to unlock the bathroom door with a butter knife because she "[knew] what was happening." (Tr. 302.) She said that Child B was crying when she got out of the bathroom.

{¶ 23} L.A. testified that Child B told her what was happening to her. When asked what she meant by that, she explained that "[i]t's like . . . if [Jackie] and [Al-Shami] is in the room doing stuff, but instead [Al-Shami] does it with my sister." (Tr. 303.)

{¶ 24} Next, Child A's Manager ("Manager") at McDonald's testified. She stated that Child A worked at McDonald's for nine months and was shy but a good worker. She explained that in June 2023, Child A had a breakdown at work. She testified that she noticed Child A crying and moved her to the office and tried to help her. She described Child A as "shaking, screaming 'Don't touch me,'" when nobody was near her. (Tr. 320.) She explained that it took Child A 45 minutes to

calm down and then the police were called but Child A would not talk to the male officers, so a female officer was dispatched. When the female officer arrived, Child A asked Manager to stay with her during the interview. Manager testified that Child A stated that "she was being abused at home sexually. He was making her go down on him. He had anal sex with her . . . anal . . . and vaginal. And she just kept going on about that." (Tr. 321.) She testified that Child A eventually stated that "he" was Al-Shami.

{¶ 25} Child B's mother, Jessica, testified next. She confirmed that Child B informed her that she was being sexually abused by Al-Shami when she was six or seven years old. She testified that she reported it and the Department of Children and Family Services ("the agency") did nothing. She explained that she tried to regain custody of Child B but was unsuccessful. Then on January 31, 2024, Al-Shami contacted her and inquired whether she wanted custody of Child B. He told her that they do not have to go through the courts, that she just needed to retrieve Child B. Jessica agreed and picked up Child B the next day but did not know of the new allegations until the agency contacted her. Child B is currently in foster care because Jessica's house is unlivable. Jessica testified that she is working on the house and working to get her daughter back.

{¶ 26} A social worker ("Social Worker") from the agency testified that she became involved with the Al-Shami family in February 2024 because the children were not attending school. While she was at the house investigating, she learned that Child B had moved in with Jessica. When questioning Child A about why Child

B moved in with Jessica, Child A stated that it was not something they were allowed to talk about. Social Worker then handed Child A a notebook and an ink pen and asked her to write what happened down. In the note, Child A disclosed that Al-Shami had sexually abused her and that Child B disclosed it was happening to her too. According to Social Worker, Child A felt that because it was no longer happening to her, she did not think it was happening to Child B. Social Worker read State's exhibit No. 11 to the jury, which included the following statements: "[o]ver three months total [Al-Shami] would touch [her]. [Al-Shami] tried taking [her] virginity. [Al-Shami] did some bad things even while [she] was asleep." (State's exhibit No. 11.) Social Worker testified that Child A was very afraid about what would happen next and did not want her parents to know what she said.

{¶ 27} A second social worker from the agency testified. She testified that she conducted the forensic interview of the girls at CAC. She explained the interview process and the varying ways in which children react to sexual abuse. The CAC interviews were played for the jury. (State's exhibit Nos. 12, 14, and 14A.) She also relayed that she had interviewed Child A previously when the allegations came to light at McDonald's. At that interview, Child A refused to talk.

{¶ 28} The Sexual Assault Nurse Examiner ("SANE nurse") who examined the alleged victims testified regarding her training and experience, as well as the exam that she performed on both girls. She testified that Child A was referred for vaginal and anal penetration. She also testified that because of the length of time

between the alleged assaults and her exam, it was unlikely that injuries would be observed. Her findings were consistent with her expectations.

{¶ 29} Detective Cynthia Adkins ("Det. Adkins") of the Cleveland Police Department Sex Crimes Unit testified to her investigation of Al-Shami. She interviewed Al-Shami who denied sexually abusing his children. His interview was played for the jury. (State's exhibit No. 20.) In the interview, Al-Shami explained that he obtained custody of Child B when she was five years old because the court found that Jessica was alienating Child B from him. Al-Shami stated that soon after coming to live with him, Child B accused him of sexually abusing her. He felt that Jessica was behind those accusations, as well as these accusations. The first agency investigation resulted in the claims being unsubstantiated.

{¶ 30} Al-Shami confirmed that he, Jackie, and his seven children lived on Hough Avenue from approximately 2010-2018. Then they lived in a shelter for seven months. In 2019, they moved to a house on Coit Road and lived there until sometime in 2021. They then moved to a house on Clybourne Avenue sometime in 2021 and remained there until 2024.

{¶ 31} When Det. Adkins confronted Al-Shami with his text messages to Jackie admitting the sexual abuse, Al-Shami explained that he only did that to get Jackie and Child B to leave the hospital because he did not want the agency involved. In his text message to Jackie, he stated that he was embarrassed and Child B may be telling the truth but he does not remember. He claimed that he

was "struggling with some deep dark inherited sh** from [his] father[.]" (State's exhibit No. 17).

{¶ 32} Jackie testified on Al-Shami's behalf. She explained that five of the seven children were her biological children, but she considered all seven her children. She confirmed that Child B reported to her that Al-Shami had touched her inappropriately in the bathroom, stating that Al-Shami tried to put his penis in Child B's buttocks. She testified that she was very upset and confronted Al-Shami. She testified that Al-Shami drove her and Child B to the hospital because she did not drive. While at the hospital, Jackie explained that she felt nervous and had "difficulty thinking." (Tr. 517.) She said they left before Child B was seen by a doctor because she did not want to lose custody of her children. Jackie testified that she did not know if Child B was telling the truth or if the accusations were prompted by Jessica. On cross-examination, she admitted that she pled guilty to attempted child endangering, a fourth-degree felony, in connection with this case.

{¶ 33} Al-Shami testified on his own behalf. He denied sexually abusing his daughters. Al-Shami admitted that he drove Jackie and Child B to the hospital because "it was the right thing to do at the time." (Tr. 547.) He explained that while Jackie was inside waiting with Child B, he texted Jackie that he did it so she would leave before the agency got involved with their family again. He testified that the agency had just closed the case where Child A made accusations of sexual abuse and neither of them wanted to go through that again. Al-Shami testified that

Jackie and Child B returned to the car and they spoke with Child B about the situation.

{¶ 34} On cross-examination, Al-Shami admitted that Child B was not a liar and had testified consistently with her CAC interview. When confronted with his text message admissions, he stated, "Put yourself in my shoes. Your children told you that you allegedly done something, you wouldn't think for a second, well, maybe I did this thing? You wouldn't think for a second that, my children aren't liars[.]" (Tr. 565.) Al-Shami also testified that he admitted the accusations in other text messages to Jackie, but the texts were not in evidence. He said those admissions were untruthful too.

{¶ 35} The jury found Al-Shami guilty of 14 counts of rape and 10 counts of GSI. The trial court sentenced Al-Shami as follows:

| Counts 8-11 | Rape (force ) | 5-7.5 years in prison |
| Count 12 | GSI | 12 months in prison |
| Count 13 | Rape  (<10) | 15 years to life in prison |
| Counts 14-16 | GSI    (<13) | 3 years in prison |
| Counts 17-18 | Rape  (<10 ) | 15 years to life in prison |
| Count 19 | GSI    (<13) | 3 years in prison |
| Counts 20-21 | Rape  (<13 ) | 10 years to life in prison |
| Count 22 | GSI    (<13) | 3 years in prison |
| Counts 23-24 | Rape  (<13) | 10 years to life in prison |
| Count 24 | Rape  (<13) | 10 years to life in prison |
| Count 25 | GSI    (<13) | 3 years in prison |
| Counts 26-27 | Rape  (<13) | 10 years to life in prison |
| Count 28 | GSI    (<13) | 3 years in prison |
| Count 29 | Rape  (<13 ) | 10 years to life in prison |
| Counts 30-31 | GSI    (<13) | 3 years in prison |

The trial court noted that none of the offenses were allied offenses of similar import, however, ordered all counts to be served concurrently. The trial court gave indefinite-sentences advisements and postrelease-control advisements. Al-Shami was given 45 days of jail-time credit. He was declared to be a Tier III sex offender. Court costs were waived.

{¶ 36} Al-Shami now appeals and raises one assignment of error for review:

> The jury verdict finding [Al-Shami] guilty on all fourteen counts of rape was not supported by sufficient evidence.

## II. Law and Analysis

{¶ 37} In Al-Shami's sole assignment of error, he asserts that there was insufficient evidence of penetration to support 14 separate incidents of rape. We find merit to Al-Shami's argument as it pertains to two counts of anal intercourse with Child B.

{¶ 38} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial

supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386. "While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, citing *Thompkins.*

{¶ 39} In this case, Al-Shami was charged with multiple counts of rape under R.C. 2907.02(A)(1)(b) and (A)(2), which prohibits a person from engaging in sexual conduct with another when the other person is less than 13 years of age or when the offender purposely compels another person to submit by force or threat of force. "Sexual conduct" is defined in R.C. 2907.01(A) as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex . . . . Penetration, however slight, is sufficient to complete vaginal or anal intercourse." "Cunnilingus" is defined as a sexual act committed with the mouth and the female sex organ. *Ohio Jury Instructions,* 2 CR § 507.02(A)(1) (Rev. Jan. 22, 2011). "Anal intercourse" is defined as penetration of the penis into the anal opening of a man or woman. *Ohio Jury Instructions*, 2 CR § 507.02(A)(1)(Rev. Jan. 22, 2011).

{¶ 40} We note that the indictment alleged numerous incidents of sexual conduct over the course of years; however, the indictment charged a single representative count of sexual conduct for each year, differentiated by the type of

conduct, the year of the conduct, the victim involved, and the age of the victim. Importantly, "Ohio courts have repeatedly held that in cases involving the sexual molestation of minor children, the state is not required to provide exact dates because the victims are simply unable to remember such facts, particularly where the repeated offenses take place over an extended period of time." *State v. Triplett*, 2013-Ohio-5190, ¶ 44 (11th Dist.), citing *State v. Lawrinson*, 49 Ohio St.3d 238, 239 (1990).

{¶ 41} Here, Al-Shami contends that his daughters' testimony regarding cunnilingus did not establish penetration of the vagina. However, under Ohio law, penetration is not required to demonstrate cunnilingus. *State v. Lynch*, 2003-Ohio-2284, ¶ 86. "[T]he act of cunnilingus is completed by the placing of one's mouth on the female's genitals." *Id.*, citing *State v. Ramirez*, 98 Ohio App.3d 388, 393 (3d Dist. 1994), and *State v. Bailey*, 78 Ohio App.3d 394, 395 (1st Dist. 1992); *State v. McCall*, 2017-Ohio-296, ¶ 9 (8th Dist.) (testimony that the victim felt something touching her vagina and that the defendant removed the victim's pants and his head was "down there" was sufficient evidence of oral rape having occurred); *State v. Rucker*, 2020-Ohio-2715, ¶ 10 (8th Dist.) (testimony that defendant removed her pants and had his mouth "by" her vaginal area for a couple of minutes coupled with her telling him "this doesn't feel good" was sufficient evidence of cunnilingus having occurred).

{¶ 42} In this case, Al-Shami was convicted of four counts rape for perpetrating cunnilingus upon Child B. Each count specified a timeframe of a year,

which included December 14, 2019, to December 13, 2020; December 13, 2020, to December 14, 2021; December 14, 2021, to December 13, 2022; and December 14, 2022, to December 13, 2023. At trial, Child B described four separate incidents of cunnilingus that encompassed the specific timeframes. She described the activity as Al-Shami putting his mouth on her private area. She confirmed that her private area was her vagina and that he was licking the inside. She said she was thinking "this is the most uncomfortable thing [she] ever felt." (Tr. 164.) She described the first incident happening in 2020 during COVID when she was nine years old and living on Coit Road. She also described an incident that happened on the couch while living on Coit where they lived until the middle of 2021. Finally, she described two incidents while living on Clybourne, one in her bedroom the first day they moved and one after he gave her a cupcake. She testified that she lived on Clybourne from the middle of 2021 until February 1, 2024.

{¶ 43} With regards to Child A, Al-Shami was convicted of two counts of rape for performing cunnilingus upon Child A over an 18-month period of time, specifically January 28, 2022, to June 24, 2023. Child A testified that Al-Shami perpetrated cunnilingus upon her when she was 14 or 15 years old. She was 14 in 2023 and reported the sexual abuse to Manager in June 2023. She described the sexual abuse as Eve eating an apple. She testified that Eve was Al-Shami and the apple was her vagina. She also testified that it happened on the couch and on at least two different beds in the house.

{¶ 44} In light of the foregoing and when viewing the evidence in a light most favorable to the State, we find that any rational trier of fact could have found beyond a reasonable doubt that Al-Shami committed four separate acts of cunnilingus on Child B and two separate acts of cunnilingus on Child A during the indicted timeframes.

{¶ 45} We now turn to Al-Shami's argument that there was insufficient evidence of penetration to establish anal intercourse. He contends that penetration can only be established for three counts involving Child B and the remaining counts should be reversed based on insufficient evidence. In support of his arguments, he cites *State v. Wells*, 2001-Ohio-3, and *In re D.C.*, 2018-Ohio-163 (8th Dist.).

{¶ 46} In *Wells*, the Ohio Supreme Court held that evidence that the defendant placed a part of his body or other object merely between the victim's buttocks is not sufficient to prove anal rape. *Id.* at ¶ 13. The *Wells* Court arrived at its holding after reviewing the common, everyday meaning of "cavity," in conjunction with "anal intercourse," reasoning that there can be penetration into the anal cavity only upon insertion of an object into the anus. *Id.* Nevertheless, the Court reiterated that penetration into the anus, however slight, is sufficient evidence of anal intercourse. *Id.*

{¶ 47} In *In re D.C.*, this court held that the juvenile court erred by adjudicating an alleged juvenile offender, D.C., delinquent for rape where it was alleged that D.C. made the victim insert his own finger into his own anus. *In re D.C.*, 2018-Ohio-163, at ¶ 2, 5, 8-9 (8th Dist.). When asked what D.C. did to the victim's

finger, the victim (who was 8 at the time of the offense and 12 at the time of trial) testified: "He drove my hand with his own hand. . . . At my rear. He drove my hand to my rear, and then . . . [h]eld my hand and he held it up to my bottom, and then — [i]nto my bottom." *Id.* at ¶ 5. No further testimony was cited in the opinion. Although recognizing that the victim testified D.C. drove his hand "into" his "bottom," the court held that, "without additional context, we cannot conclude the word 'bottom' meant anal opening as opposed to merely between the cheeks of the victim's buttocks." *Id.* at ¶ 8.

{¶ 48} The court explained:

> Child victims tend to have a limited understanding of human physiology. This fact and the tendency of parents to have their children use euphemisms for intimate parts of the body make it difficult to know exactly what children mean when they give testimony about certain sexual conduct. The inherent imprecision of euphemisms for intimate body parts becomes an issue for purposes of anal rape. "If the evidence shows that the defendant made contact only with the victim's buttocks, there is not sufficient evidence to prove the defendant guilty of the crime of anal rape." *State v. Wells*, 91 Ohio St.3d 32, 2001-Ohio-3, 740 N.E.2d 1097.
>
> In cases finding sufficient proof of anal penetration, victims have given testimony showing actual penetration. See, e.g., *State v. Landers*, 2d Dist. Greene No. 2015-CA-74, 2017-Ohio-1194, ¶ 79 (victim testified that "penis went 'in' her 'butt' and went into her 'butthole,' but not all the way"); *State v. Phillips*, 6th Dist. Lucas No. L-09-1149, 2010-Ohio-2577, ¶ 58 (victim testified she felt what she believed was fingers "in my bottom" and answered affirmatively when asked if "fingers in her bottom meant your butt where you go to poop out of?"); *State v. Molen*, 2d Dist. Montgomery No. 21941, 2008-Ohio-6237, ¶ 31 (victim testified that defendant shoved something "up his butt" and that what had been put in his butt was "tickling [his] stomach"). That kind of evidence is not present in this case.

*In re D.C.* at ¶ 6-8.

{¶ 49} In the instant case, Al-Shami was convicted of six counts of anal intercourse with Child B, which included original Count Nos. 13, 17, 20, 23, 26, and 29. After careful review of the testimony, we find that there was sufficient evidence of penetration to establish four counts; however, there was insufficient evidence of penetration to establish two counts.

{¶ 50} Specifically, we find that there was sufficient evidence to establish penetration with regards to Count Nos. 17, 20, 23, and 26, because, unlike the victims in *Wells* and *In re D.C.*, Child B described four separate incidents of anal penetration that hurt as opposed to when she testified that Al-Shami "tried" to penetrate her but was unsuccessful. The following testimony supports this conclusion:

Child B: [Al-Shami] was putting his private area in my behind. But not – no, I think he might actually have been trying that time.

State: How do you know [Al-Shami] was trying that time?

Child B: Because it hurt.

State: How long did it hurt?

Child B: For a while.

State: Did it hurt when [Al-Shami] stopped, or did it feel better when [Al-Shami] stopped?

Child B: There was still, like, pain after he stopped for a little bit, but then it stopped.

State: Is that the first time you actually felt it hurt back there?

Child B: I don't think so, but I don't remember the first time that I recall it hurting back there.

(Tr. 175-176.)

{¶ 51} In addition, Child B testified that "I believe each time that he's done that [anal penetration], I believe each time it has hurt the same, but I could be wrong." (Tr. 185.) She confirmed that Al-Shami's "private area" was his penis and her "behind" was the hole in her buttocks. (Tr. 203 and 205.) In addition, she described his penis as "[i]n the middle, kind of like soft, hardish. . . . [k]ind of, like, straight." (Tr. 173.) Notably, Child B described four incidents that "hurt": (1) when she was nine-years old and watching "Sunny Bunnies" in Al-Shami's bedroom; (2) in the shower on Coit Road; (3) in her new bedroom on Clybourne; and (4) in her bedroom when Al-Shami told her Child A let him penetrate her because was a good girl.

{¶ 52} Based on the foregoing testimony, we find that there was sufficient evidence of penetration to establish four acts of anal intercourse committed on Child B. And each of these incidents align with the timeframes delineated in the indictment, including December 14, 2019, to December 13, 2020; December 14, 2020, to December 13, 2021; December 14, 2021, to December 13, 2022; and December 14, 2022, to December 13, 2023.

{¶ 53} Nevertheless, we find that there is insufficient evidence to establish penetration of Child B as it pertains to Counts 13 and 29, because in both incidents, Child B testified that Al-Shami "tried" to put his "private area" in her "behind," but was not successful. Specifically, Count 13 alleged that the first incident of anal intercourse occurred sometime between December 14, 2016, and December 13,

2017, when Child B was six years old. However, Child B testified that when she was six years old and Al-Shami first tried to put his "private area" in her "behind," she clarified that "[i]t was just there. Like, it didn't feel like he was trying to get it in." (Tr. 145.) Based on this testimony, we find that there is insufficient evidence of penetration to sustain a conviction for original Count 13, renumbered as Count 6.

{¶ 54} Likewise, in Count 29, the last incident of anal intercourse was alleged to have occurred on January 31, 2024; however, Child B testified that he was "just rubbing it around there." (Tr. 195.) In light of this testimony, we find that there was insufficient evidence of penetration to sustain a conviction for original Count 29 renumbered as Count 22.

{¶ 55} We now turn to Al-Shami's argument that Child A did not testify that anal intercourse occurred and thus Counts 10 and 11 should be reversed. We find Al-Shami's argument unpersuasive. Although Child A did not testify regarding incidents of anal intercourse, other testimony established anal intercourse. Particularly, Manager testified that Child A disclosed to her and the police that Al-Shami had anal intercourse with Child A. In addition, Social Worker testified that Child A disclosed to Social Worker that Al-Shami had done to Child A what Child B was alleging Al-Shami did to her, which included anal intercourse, and that it happened over a three-month period. Also, the SANE nurse testified that she examined Child A based on reports of anal intercourse. Finally, Al-Shami commented to Child B that Child A let him penetrate her because she was a good

girl. Based on the foregoing evidence, we find that there was sufficient evidence of anal intercourse involving Child A.

{¶ 56} Therefore, when viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found beyond a reasonable doubt that Al-Shami committed four separate acts of anal intercourse on Child B and two separate acts of anal intercourse on Child A during the stated timeframes.

{¶ 57} Accordingly, Al-Shami's sole assignment of error is overruled in part and sustained in part.

{¶ 58} Judgment is affirmed in part and vacated in part. The convictions on original Count Nos. 13 and 29, renumbered as Count Nos. 6 and 22, are hereby vacated. The remaining counts and sentences are hereby affirmed:

| Count 8 | Rape (force – cunnilingus) | 5-7.5 years in prison |
|---|---|---|
| Count 9 | Rape (force – cunnilingus) | 5-7.5 years in prison |
| Count 10 | Rape (force – anal intercourse) | 5-7.5 years in prison |
| Count 11 | Rape (force – anal intercourse) | 5-7.5 years in prison |
| Count 12 | GSI (touching penis) | 12 months in prison |
| Count 14 | GSI (<13 - touching penis) | 3 years in prison |
| Count 15 | GSI (<13 - touching penis) | 3 years in prison |
| Count 16 | GSI (<13 - touching penis) | 3 years in prison |
| Count 17 | Rape (<10 – anal intercourse) | 15 years to life in prison |
| Count 18 | Rape (<10 – cunnilingus) | 15 years to life in prison |
| Count 19 | GSI (<13 - touching penis) | 3 years in prison |
| Count 20 | Rape (<13 – anal intercourse) | 10 years to life in prison |
| Count 21 | Rape (<13 – cunnilingus) | 10 years to life in prison |
| Count 22 | GSI (<13 - touching penis) | 3 years in prison |
| Count 23 | Rape (<13 – anal intercourse) | 10 years to life in prison |
| Count 24 | Rape (<13 – cunnilingus) | 10 years to life in prison |
| Count 25 | GSI (<13 - touching penis) | 3 years in prison |
| Count 26 | Rape (<13 – anal intercourse) | 10 years to life in prison |
| Count 27 | Rape (<13 – cunnilingus) | 10 years to life in prison |
| Count 28 | GSI (<13 - touching penis) | 3 years in prison |
| Count 30 | GSI (<13 - touching penis) | 3 years in prison |

Count 31     GSI     (<13 - touching penis)     3 years in prison

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, A.J., and
EILEEN T. GALLAGHER, J., CONCUR